IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ARMESHA JONES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.   13 C 6432 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| ADVOCATE NORTH SIDE HEALTH | ) | |
| NETWORK, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Armesha Jones filed a second amended four-count complaint against defendant Advocate North Side Health Network ("Advocate"), alleging that defendant harassed and discriminated against her based on race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") (Count I), and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") (Count III), and retaliated against her for opposing and/or complaining about defendant's discriminatory practices in violation of Title VII (Count II) and Section 1981 (Count IV). Defendant filed the instant motion for summary judgment pursuant to Fed. R. Civ. P. 56, arguing that no genuine issue of material fact exists and it is entitled to judgment as a matter of law.[1] For the reasons discussed below, defendant's motion for summary judgment is granted in part and denied in part.

---

[1]In her response brief, plaintiff requests that the court strike defendant's motion for summary judgment for failure to comply with this court's standing order. Defendant subsequently filed a motion (doc. 120) to deny plaintiff's request. Although defendant's memorandum of law in support of its motion for summary judgment does not comply with this court's standing order barring incorporation of another pleading to avoid Local Rule 7.1's 15-page limitation, the court, in its discretion, declines to strike defendant's motion or memorandum in support. Defendant, however, is admonished that the rules of this court apply to it as they do to any litigant.

## BACKGROUND[2]

Plaintiff, an African American female, began her employment with defendant in 2003. In May 2010, plaintiff began working as a Bed Control Clerk in the Patient Access Department of Advocate Illinois Masonic Medical Center ("Advocate Masonic"). In the first week of her new position, plaintiff reported to her manager, Phillip Quick, a Caucasian male, that during her training sessions plaintiff's co-worker, Marianne Deguzman, was using "slurs and threats" towards her. Quick told plaintiff that he was aware of the situation and would talk to plaintiff's trainer. Between this time and June 15, 2010, plaintiff did not make any further complaints about Deguzman. However, on June 15, 2010, plaintiff was involved in a verbal altercation with Deguzman. Deguzman was subsequently fired, and plaintiff was given a Level 3[3] discipline report for her part in the altercation. Plaintiff disputed the disciplinary action with Kevin Welsh, Advocate's Human Resources Manager, who reduced the discipline report to a Level 1.

Following this incident, and until the end of March 2011, plaintiff did not have any complaints about her working conditions. On March 29, 2011, Quick issued a Level 1 discipline warning to plaintiff for "exceeding Advocate's system wide attendance policy." Plaintiff met with Quick and Welsh to contest the discipline warning, arguing that the alleged attendance policy violation was incorrect. During the meeting, plaintiff complained that she thought the

---

[2]The following facts are, unless otherwise specified, undisputed and come from the parties' Local Rule 56.1 statements and responses.

[3]Advocate Masonic has a progressive discipline system, consisting of three levels. A Level 1 discipline warning is generally issued for attendance, policy, or certain behavioral misconduct, and remains on an employee's record for six months. A Level 3 discipline warning is a final warning and remains active for twelve months. If an employee incurs an additional disciplinary infraction within those twelve months, the employee may be fired.

discipline warning constituted harassment by Quick. After the meeting, Welsh told plaintiff that he would remove the Level 1 discipline warning from her file. The Level 1 report, however, remained in plaintiff's file until 2012.

On May 2, 2011, plaintiff emailed her application and resume to Mike Sciarabba, the Director of the Patient Access Department, to apply for a Patient Access Supervisor position. The job posting for the position required that, at a minimum, the candidate have completed at least two years of college and be a certified healthcare access associate ("CHAA"). Plaintiff was not a CHAA at the time she submitted her application for the position, but did have the requisite amount of college education. Plaintiff interviewed with Quick and one other staff member for the position on July 7, 2011. Elena Colon, a Hispanic applicant, was hired for the supervisor position instead of plaintiff. Colon was a CHAA at the time she applied for the supervisor position, but had attended college for less than two years. Colon, unlike plaintiff, had prior supervisory experience managing a patient access center.

In October 2011, plaintiff met with Quick concerning a performance review that he had drafted. Under the "Behavioral Expectations" section of the review, Quick wrote that working as a team was "another area [plaintiff] has made significant strides in. At the beginning of this review period, [plaintiff] had a conflict with a peer that resulted in corrective action on both parties. Over a course of a year [plaintiff] has built strong relationships with her peers and created a strong working environment." Plaintiff viewed the language in the performance review as negative. Plaintiff subsequently met with Quick, Sciarabba, and Linda Sanders, who had replaced Welsh as Human Resources Manager, to contest the language. Quick agreed to remove the contested statement from the review.

In late January 2012, Colon, the new Patient Access Supervisor, informed plaintiff that she would like to meet with plaintiff and Quick concerning communication issues that had arisen between her and plaintiff. On February 2, 2012, plaintiff met with Quick and Colon, at which time Quick informed plaintiff that he wanted her to participate in an Employee Assistance Program ("EAP"). The program "offers free counseling services to associates who are experiencing challenges in their work or personal lives, including but not limited to, financial matters, divorce matters, relationships with coworkers, or relationships with bosses." As a part of the program, "[a] learning plan is issued to help develop an associate and is a plan between an associate and the associate's manager to talk about opportunities to improve." In response, plaintiff walked out of the meeting. Thereafter, plaintiff received a voicemail from Sanders, informing her that she "would not be terminated for refusing the EAP learning plan." Quick and Sanders also called plaintiff, telling her to "return to work as scheduled."

Following this meeting, on February 8, 2012, plaintiff emailed Sciarabba, stating that:

> Since I transferred into bed management two years ago[.] I have experienced harassment from my manager. My first 30 days was filled with name calling, racial/gender slurs, and being exposed to sexual conversations and content. Since then I've had numerous visits to the Human Resource department fighting off unwarranted levels in my file.

Plaintiff met with Quick, Colon, Sanders, and Sciarabba the next day to address the concerns raised in her email. The meeting attendees agreed, among other things, that plaintiff would not be referred to an EAP or placed on a learning program. After the meeting, Sanders emailed plaintiff a summary of what was discussed during the meeting, including a line-by-line response to each of the concerns raised in plaintiff's February 8, 2012, email. Sander's email stated that during the meeting, plaintiff and Quick had "reached a common ground for communicating concerns," and that the name

4

calling, racial slurs, and sexual conversations were no longer occurring following the termination of the offending employee nearly two years ago.

In April 2012, plaintiff applied for a Pre-Access Quality/Order Management Specialist position in her department and interviewed in that same month. The job required, at minimum, a "basic knowledge of ICD-9-CM diagnosis and CPT coding." Plaintiff had completed courses in CPT coding and ICD-9-CM prior to her application for the specialist position. Lila Augello, a Hispanic candidate who had experience with ICD-9 and CPT codes through her prior roles at Advocate,[4] was hired for the position.

On June 15, 2012, Advocate Masonic's President sent a memorandum to Advocate Masonic employees stating that Advocate would be "redesigning how patient care is managed and delivered in some areas of the hospital, as well as defining opportunities to streamline [its] support functions," and that "[s]ome staff positions at Illinois Masonic will be affected by this redesign." The memorandum further stated that "[f]or every associate directly impacted, options will be offered for positions at Illinois Masonic or another Advocate Health Care site." After receiving the memorandum, plaintiff met with Quick, who informed her that the Patient Access Department's overnight shift, in which she worked, would be eliminated.[5] Quick, however, offered plaintiff the option to apply for two alternative positions in the Patient Access Department at Advocate Masonic, but plaintiff declined to apply for either position. A July 5, 2012, an Advocate redeployment status

---

[4]Citing pages 262-263 of her own deposition transcript, plaintiff denies that Augello had experience with ICD-9 and CPT codes. However, neither plaintiff nor defendant has provided the court with page 263 of plaintiff's deposition transcript, and page 262 does not support plaintiff's denial.

[5]The parties dispute whose decision it was to specifically eliminate the overnight shift.

report indicated that there was a "high confidence of placement" with respect to plaintiff securing another position with Advocate.

As a result of the Patient Access Department overnight shift being eliminated, three other women also lost their positions.[6] All three women, however, secured other employment with Advocate Masonic. Ladonna Dortch, an African American female, applied, and was hired, for a position as a Patient Access Rep I, and began this new position on July 29, 2012. Azra Mulaomerovic, a Caucasian female, applied, and was hired, for a position as a Patient Access Rep I, and started this new position on July 15, 2012. Sandra Davenport, an African American[7] female, was terminated effective July 28, 2012, but ultimately was hired for a new position with defendant. Plaintiff applied for numerous[8] positions with defendant during the restructuring period. Plaintiff interviewed for three of these positions: (1) Patient Financial Counselor at Advocate South Suburban Hospital; (2) Reimbursement Specialist at Advocate Medical Group in Des Plaines, Illinois; and (3) Insurance Collection Representative at Advocate Condell Medical Center. A staffing consultant from Advocate Condell Medical Center contacted Quick concerning plaintiff's application. Quick told the staffing consultant that plaintiff had "positive qualities" and "does a great interview," but "has some issues with [ ] not wanting to be 'managed'" and that the hospital would "need to have

---

[6]Two of the women, Azra Mulaomerovic and Sandra Davenport, worked as Patient Access Concierges, and one of the women, Ladonna Dortch, shared plaintiff's role as a Bed Control Clerk.

[7]Plaintiff, without any citation to the record in support, denies that Davenport is African American. Because this statement of fact is not properly disputed, the court deems it admitted.

[8] Plaintiff alleges she applied for approximately twenty-five open positions with defendant during the restructuring period, while defendant alleges that plaintiff applied to approximately sixteen open positions.

6

the time to work closely with her to develop her." Plaintiff was not hired for any of the positions for which she applied.

On July 11, 2012, plaintiff emailed Albert Lewis, a member of Human Resources, that she felt she was discriminated against during her employment at Advocate Masonic. In particular, plaintiff stated that Quick was "eliminating the bed management night shift positions and moving all of the duties to E/R under the supervision of Elena Colon, so my co-worker and I will be left with no job if we are unable to get rehired by another Advocate Health Care site." Plaintiff further wrote that Quick had "created two new jobs that we can apply for but four people are interviewing for it, and I feel that Elena will not chose me because of our passed[sic] encounters." Plaintiff concluded that she thought "all of these things are happening because [Quick] wants to get rid of me."

On or around this same date, plaintiff also left a voicemail message on Advocate's hotline system relating to alleged discrimination and retaliation she had faced. Jeffrey Teske, a representative from the hotline, responded to plaintiff's message, at which time plaintiff told him that she was going to file an EEOC charge. On July 13, 2012, plaintiff emailed Teske a summary of what she planned to file with the EEOC.

On July 16, 2012, plaintiff emailed Quick to inquire about her position's end date. Quick told plaintiff that her transition date was in "limbo." Plaintiff filed a charge with the EEOC that same day, stating that during her employment with Advocate she had "been subjected to different terms and conditions of employment than non-Black employees; including, but not limited to, being harassed, and denied promotional opportunities." The EEOC charge further stated that she had been informed that her position as a Bed Control Clerk was being eliminated, and that she had "applied and was not fired for many other positions."

Prior to filing her EEOC charge, Advocate documents tracking the restructuring indicated that as of July 12, 2012, plaintiff was "interviewing" for jobs within Advocate. Advocate records from July 23, 2012, however, show that plaintiff's status had changed to "severance anticipated." On July 30, 2012, plaintiff told Sanders that she had filed an EEOC charge. On July 31, 2012, Quick emailed Sciarabba, stating, among other things, that he "need[ed] [Sciarabba's] assistance with Armesha and putting together the 'business reason' for closing bed management."

Plaintiff was informed during a meeting on August 1, 2012, with Sanders and Quick that she was terminated. Immediately following the meeting, Sanders told plaintiff that defendant would give her a severance payment in exchange for her withdrawing her EEOC claim, which she declined to do. An Advocate redeployment status report dated September 4, 2012, indicated that plaintiff had interviewed for three positions within the Advocate health network, but that none of the interviews had been successful. The status report also indicated that plaintiff had been offered, but declined, to take a part time position with Advocate. The status report further stated that plaintiff had filed an EEOC charge.

On September 17, 2012, Quick posted two positions – one for a Patient Access Representative and one for a Financial Services Specialist – that were nearly identical to plaintiff's former position as a Bed Control Clerk. Plaintiff applied for both positions through Advocate's online portal on September 18, 2012. Following her application, the Financial Services Specialist position was canceled. Christie Greshman, a non-black applicant, was hired for the Patient Access Representative position.

On October 18, 2012, plaintiff filed a second EEOC charge, alleging again that she had been "subjected to different terms and conditions of employment than non-Black employees; including

but not limited to being harassed and denied promotional opportunities." The charge further stated

that she had been informed that her "position was going to be eliminated" and that she "would be

transferred to another position within Advocate." Plaintiff complained that "[a]lthough [she] applied

for many transfers, Advocate denied [her] all of the transfers [she] requested." The charge notes that

she filed an EEOC charge on July 16, 2012, and was terminated on August 1, 2012.

## DISCUSSION

### 1.      Legal Standard

A movant is entitled to summary judgment pursuant to Fed. R. Civ. P. 56 when the

moving papers and affidavits show that there is no genuine issue of material fact and the movant

is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986). Once a moving party has met its burden, the nonmoving party must go

beyond the pleadings and set forth specific facts showing that there is a genuine issue for

trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum–Hill Assoc., Inc., 914 F.2d 107, 110 (7th

Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the

light most favorable to the party opposing the motion. See Green v. Carlson, 826 F.2d 647, 651

(7th Cir. 1987).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986). The nonmoving party must, however, "do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the

9

[nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

**2.      Analysis[9]**

Plaintiff alleges that defendant both discriminated and retaliated against her in violation of Title VII and Section 1981. "The substantive standards and methods of proof that apply to Title VII race discrimination and retaliation claims also apply to [plaintiff's] claims under 42 U.S.C. § 1981." Liu v. Cook Cty., 817 F.3d 307, 315(7th Cir. 2016). Accordingly, the court analyzes plaintiff's Title VII and § 1981 claims simultaneously.

**A.      Discrimination Based on Race - Counts I & III**

Under Title VII, it is "unlawful for an employer to discharge or discipline an employee because of that person's race, sex, or other grounds." Coleman v. Donahoe, 667 F.3d 835, 845 (7th Cir. 2012). A plaintiff can use either the direct or indirect method of proof in order to pursue a discrimination against his employer. Id. Plaintiff attempts to proceed using both methods.

**i.      Failure to Promote**

Plaintiff alleges that she was unlawfully discriminated against based on her race when defendant did not promote her to either the Patient Access Supervisor position that she applied and interviewed for in May 2011 or the Financial Management position that she applied and interviewed for in April 2012. As discussed above, plaintiff can survive defendant's motion with

---

[9] Plaintiff's brief does not respond to defendant's arguments concerning her allegations of hostile work environment and discrimination and retaliation based on various disciplinary actions. Nor does plaintiff respond to defendant's arguments concerning alleged retaliatory acts occurring prior to her July 16, 2012, EEOC charge. The court assumes plaintiff does not have a meritorious response in opposition, and therefore grants defendant's motion with respect to these claims.

respect to her failure to promote claim by directly showing that defendant's decision was motivated by racial discrimination (the "direct method") or by employing the burden-shifting method set forth in McDonnel Douglas Corp. v. Green, 411 U.S. 792 (1973) (the "indirect method").

Under the direct method, "the plaintiff may avoid summary judgment by presenting sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." Coleman, 667 F.3d at 845. Direct proof consists of "admissions or near admissions that an employer acted based on discriminatory animus." Sanford v. Walgreen Co., No. 08-C-6325, 2010 WL 380907, at *3 (N.D. Ill. Jan. 27, 2010) (internal quotations omitted). Absent direct evidence of discrimination, a plaintiff can prevail under the direct method by painting a "convincing mosaic of circumstantial evidence sufficient to permit a jury to infer that discrimination motivated" the adverse employment action. Chaib v. Geo Grp., Inc., 819 F.3d 337, 342 (7th Cir. 2016) (internal quotations omitted). In order to be compelling, the mosaic must "directly point to a discriminatory reason for the employer's action and also be directly related to the employment decision." Whitfield v. Int'l Truck & Engine Corp., 755 F.3d 438, 443 (7th Cir. 2014). "It will not do for plaintiff to assemble an amorphous litany of complaints about a myriad of workplace decisions." Id. (internal quotations omitted).

Under the indirect method of proof, a plaintiff can establish a prima facie case of employment discrimination based on failure to promote by showing "(1) he was a member of a protected class; (2) he applied for an open position for which he was qualified; (3) he did not receive the position; and (4) those who were hired were not in the protected class and had similar or lesser qualifications." Id. at 444. If the plaintiff is able to establish a prima facie case, the

burden then shifts to plaintiff's employer to "introduce a legitimate, nondiscriminatory reason for the employment action." Naficy v. Illinois Dep't of Human Servs., 697 F.3d 504, 511 (7th Cir. 2012). A plaintiff can then avoid summary judgment by showing the employer's reason for the employment action "is pretextual." Id. at 511-512.

***Patient Access Supervisor Position***

Plaintiff alleges that defendant discriminated against her based on her race by not promoting her to the Patient Access Supervisor position she applied for in May 2011. Defendant instead hired Colon, a Hispanic female, for the position. Plaintiff, however, has failed to overcome defendant's motion with respect to the Patient Access Supervisor position, because she has not shown that defendant's decision was motivated by racial discrimination via the direct method of proof nor satisfied the burden-shifting approach of the indirect method.

With respect to the indirect method of proof, plaintiff has not established a prima facie case. It is undisputed that one of the job requirements for the Patient Access Supervisor position was that the applicant be a CHAA, which plaintiff was not at the time she interviewed. Although plaintiff had completed the requisite amount of college education, and Colon had not, plaintiff's prima facie case under the indirect method of proof requires that plaintiff establish her own qualifications for the position. Because plaintiff has failed to establish[10] that she was qualified for the supervisor position to which she applied, she cannot satisfy the requirements for a prima facie case with respect to defendant's failure to promote her to the position.

_____

[10]Plaintiff mistakenly argues in her response brief that "Defendant has not met its burden to show that Plaintiff was not qualified for the position." It is, however, plaintiff's burden to establish each element of her prima facie case, including that she was qualified for the open position to which she applied.

Even assuming *arguendo* that plaintiff has established a prima facie case under the indirect method of proof, she has not shown that defendant's reason for not hiring her was pretextual. Defendant's legitimate, nondiscriminatory reason for not hiring plaintiff for the supervisory position was that she did not meet the minimum requirements and Colon was more qualified. As discussed above, it is undisputed that a requirement for the supervisor position was that the applicant be a CHAA and that plaintiff did not hold any such certification at the time she interviewed for the position. It is also undisputed that Colon, whom defendant hired to fill the position, was a CHAA at the time she interviewed for the position. Although Colon did not have the requisite amount of college experience, it is undisputed that she had supervisory experience through her previous positions and that plaintiff did not.

Plaintiff argues that Quick's deposition testimony – in which he testified that plaintiff did not apply for the supervisor position through the online applicant tracking system, and thus was not considered by him as a formal candidate for the position – establishes that defendant's nondiscriminatory reason for the employment action is pretextual. However, regardless of whether Quick viewed plaintiff as a formal applicant for the position, it is undisputed by the parties that she interviewed for the position and did not meet the position's qualification requirements. In fact, Quick's notes from plaintiff's interview for the position indicate that plaintiff was not a CHAA, noting in parentheses that the certification was a "minimum requirement." The interview notes further state that plaintiff "has not held a position with direct patient contact" and "does not have previous [s]upervisory experience." Quick's last note states that the "[o]ther candidate [is] more qualified." These notes are consistent with defendant's nondiscriminatory reason for not hiring plaintiff for the supervisory position.

13

Plaintiff also fails to satisfy the direct method of proof by painting a convincing mosaic of circumstantial evidence sufficient to permit a jury to infer that discrimination motivated defendant's decision not to hire her for the supervisor position.[11] Chaib, 819 F.3d at 342. Even looking at the "totality of the circumstances," the circumstantial evidence that plaintiff directs the court to neither "directly point[s] to a discriminatory reason for the employer's actions" nor is it directly related to the employment decision at issue – defendant's failure to hire plaintiff for the Patient Access Supervisor position. Whitfield, 755 F.3d at 443. Contrary to plaintiff's argument, there is nothing discriminatory about Quick not formally considering plaintiff for the position because she failed to apply for the position through the proper channels. Similarly, the fact that plaintiff had, a year earlier, been subject to racial slurs by a coworker who was fired a month later, or that plaintiff received two disciplinary warnings over the course of a year does not support an inference that defendant's decision not to hire plaintiff for the supervisor position was impermissibly based on plaintiff's race. See, e.g., Chaib, 819 F.3d at 342 (finding that that co-worker's racist comments were unrelated to the adverse employment action at issue). Consequently, plaintiff has failed to establish, either directly or indirectly, that defendant discriminated against her when it failed to promote her to the Patient Access Supervisor position, and as such, her claim fails as a matter of law.

### Pre-Access Quality/Order Management Specialist Position

Plaintiff further alleges that defendant discriminated against her by not hiring her for the Pre-Access Quality/Order Management Specialist position to which she applied in April 2012.

---

[11]The court notes that plaintiff's entire discussion of the direct method with respect to each of her discrimination claims is a single sentence.

Defendant, as discussed above, ultimately hired Augello, a Hispanic female, for the position. While plaintiff is able to establish a prima facie case under the indirect method, she again has failed to establish that defendant's rationale for the employment action was pretextual in nature.

Plaintiff is a member of a protected class and applied for the open position of Pre-Access Quality/Order Management Specialist, and did possess many of the requisite skills necessary for the job. The necessary skills plaintiff possessed included ICD-9 and CPT coding. Augello, who is Hispanic and not a member of plaintiff's protected class, had similar qualifications, such as ICD-9 and CPT coding experience learned from her prior positions with Advocate, and was hired for the position. As such, plaintiff has established a prima facie case.

Defendant, however, has provided a legitimate, nondiscriminatory reason for hiring Augello over plaintiff.[12] It is undisputed that one of the qualifications for the position was the "ability to master all computer software associated with duties with[in] Patient Access Pre-Service realm." The "software encompassed by this qualification includes an e-Order Tool, Cerner Scheduling, and Passport." Defendant asserts, and plaintiff does not deny, that Augello had knowledge of the "e-Order Tool" software, and plaintiff did not.[13] Moreover, Quick testified

---

[12]The court notes that plaintiff's response brief argues that "Defendant has failed to set forth a business rationale for their decision" beyond the "broad and general statement that [plaintiff] 'did not meet the minimum requirements for those positions and/or there were more qualified candidates.'" According to plaintiff, because she has established a prima facie case, including that she was qualified for the position, defendant's business rational cannot be legitimate. The prima facie case, however, requires only that plaintiff establish her own qualifications, not that the individual hired was better qualified.

[13]The court deems defendant's statement of fact no. 49 admitted. Plaintiff's response to the statement of fact, in which she admits that Quick testified to the above information, "but does not comment on the veracity" of his testimony, is an improper answer. See McGuire v. United Parcel Serv., 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in

(continued...)

that prior to the role being created, Augello had been "doing the role informally." Plaintiff has provided no evidence that defendant's rationale for its employment decision is merely pretextual.

Plaintiff also does not have any "direct evidence, such as an outright admission of discrimination" that defendant's employment action to hire Augello over her was motivated by discrimination. Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 695 (7th Cir. 2006) (internal quotations omitted). Contrary to plaintiff's conclusory arguments, the facts establishing her prima facie case are not sufficient "enough for plaintiff to move forward with respect to [her failure to promote claim] under the direct method." Instead, without direct evidence that defendant's decision was motivated by discriminatory animus, plaintiff, as discussed above, "must paint a convincing mosaic of circumstantial evidence sufficient to permit a jury to infer that discrimination motivated" the adverse employment action. Chaib, 819 F.3d at 342. The fact that plaintiff was qualified for the position and another non-black candidate with similar qualifications was hired is not sufficient to create a convincing mosaic of circumstantial evidence. Because plaintiff cannot show that defendant's decision not to hire her for the Pre-Access Quality/Order Management Specialist position was motivated by discriminatory animus under either the direct or indirect approach, her claim fails as a matter of law.

### ii. Termination & Failure to Hire

Plaintiff further alleges she was subject to unlawful discrimination when defendant eliminated the Patient Access Department overnight shift, failed to hire her for another position, and ultimately terminated her. Plaintiff does not have any direct evidence that defendant's

---

[13](...continued)
the numbered paragraph with citations to supporting evidence in the record constitutes an admission.")

decision to eliminate her position or not hire her for another position thereafter was discriminatory. Specifically, plaintiff has not directed the court to, and the court's extensive review of the record has not revealed, any explicit admission by defendant that its decision not to hire plaintiff for any of the many positions she applied was motivated by her race. Nor has plaintiff identified any circumstantial evidence, such as defendant's behavior towards other employees in the protected group, evidence that similarly situated employees outside of the protected group received better treatment, or evidence that defendant offered a pretextual reason for its decisions. See Diaz v. Kraft Foods Global, Inc., 653 F.3d 582, 587 (7th Cir. 2011).

Because plaintiff cannot show that defendant's adverse employment decisions were motivated by racial animus, plaintiff must proceed under the indirect method of proof. With respect to her failure to hire claims, plaintiff must establish that: (1) she was a member of a protected class; (2) applied for an open position for which she was qualified; (3) did not receive the position; and (4) those who were hired were not in the protected class and had similar or lesser qualifications. Whitfield, 755 F.3d at 444. Plaintiff, however, fails to establish a prima facie case because she has established neither her qualifications for each position nor that the person who was hired instead of her was outside of her protected class or had similar or lesser qualifications.

With the exception of the position that she applied to at Advocate's Condell Medical Center, plaintiff has not provided any evidence concerning her qualifications for the numerous positions for which she applied prior to her August 1, 2012, end date or established who, if anyone, was ultimately hired for the positions. Although the interviewer's notes from plaintiff's interview for the Insurance Collection Representative position at Advocate's Condell Medical

17

Center indicate that plaintiff was qualified for the position, plaintiff has not submitted evidence concerning who was hired instead of her. Similarly, while the court can reasonably infer that plaintiff was qualified for the Patient Access Representative position that she applied to in September 2012 based on the position's similar nature to her previous position, the record contains no evidence that the candidate defendant hired instead of plaintiff had similar or lesser qualifications.[14]

Proceeding via the indirect method with respect to her claim that the overnight bed control shift was eliminated for discriminatory reasons, plaintiff must show that, "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employers' legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." Ptasznik, 464 F.3d at 696. Although plaintiff is able to satisfy the first three prongs of her prima facie case, it is questionable whether she has established that similarly situated employees outside of her protected class were treated more favorably.

As discussed previously, four employees, including plaintiff, had their positions eliminated as a result of Advocate Masonic restructuring its Patient Access Department. Two of these individuals, however, were African American, and therefore do not serve as adequate

_____

[14]Plaintiff's statement of fact no. 38 states that "Quick hired an outside, non-black candidate with no college education or Advocate employment status," citing page 237 of Quick's deposition testimony in support. Although page 237 of Quick's deposition testimony supports that the applicant who received the job was not African American, it does not support plaintiff's statement that the applicant had no college education or former employment with Advocate.

comparators.[15] The only employee plaintiff identifies outside of her protected class that was allegedly treated better is Azra Mulaomerovic, who, unlike plaintiff, was not a Bed Control Clerk, but a Patient Access Concierge.  See Coleman, 667 F.3d at 846 (holding that similarly situated employees "must be directly comparable to the plaintiff in all material aspects, but they need not be identical in every conceivable way" (internal quotations omitted)). In addition to having a different position than plaintiff, Mulaomerovic, along with the other two employees who were affected by the restructuring and unlike plaintiff, applied to a position at Advocate Masonic. Accordingly, the court is not convinced that plaintiff has established that similarly situated employees outside of her protected class were treated more favorably by defendant.

However, assuming *arguendo* that plaintiff has established a prima facie case, she cannot show that defendant's legitimate, nondiscriminatory reason for eliminating her shift, resulting in her ultimately being terminated, was pretextual. The record reveals that defendant underwent a large restructuring, effecting Advocate Masonic (where plaintiff worked), as well other Advocate sites, such as Advocate Christ Hospital and Advocate Good Samaritan Hospital. Although the parties dispute who made the decision to eliminate the overnight shift in Advocate Masonic's Patient Access Department, it is undisputed that four employees, including plaintiff, had their positions eliminated as a result. Three of these employees, including plaintiff, were African American and one was Caucasian. It is also undisputed that Quick and Sanders suggested that plaintiff apply for two different positions in Advocate Masonic's Patient Access Department, but that plaintiff chose not to apply for either position, opting instead to seek

---

[15]The court notes that Ladonna Dortch, who shared plaintiff's role as an overnight bed control clerk and was subsequently rehired following the shift's elimination, was African American.

employment at other Advocate sites. The other three employees whose positions were also eliminated each applied to and received positions at Advocate Masonic. Consequently, the court finds that defendant is entitled to judgment as a matter of law with respect to plaintiff's discrimination claims (Counts I and III).

### B.      Retaliation - Counts II & IV

Counts II and IV allege that defendant unlawfully retaliated against her by firing her and failing to re-hire her for another position after she filed her July 16, 2012 EEOC charge. Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." Tomanovich v. City of Indianapolis, 457 F.3d 656, 662 (7th Cir. 2006) (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." Id. (internal quotations omitted). Under the direct method of proof, a plaintiff must show that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) [there was] causal connection exists between the two." Id. at 663 (internal quotations omitted). Defendant argues that plaintiff has failed to establish a causal connection between her July 16, 2012, EEOC charge and the August 1, 2012, termination and September 2012 decision not to hire.

Although the court agrees with defendant that "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the later," plaintiff has identified additional evidence that could establish a causal connection between the two. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011). Advocate documents tracking the restructuring indicated that as of July 12, 2012,

20

plaintiff was "interviewing" for jobs with defendant. On July 13, 2012, plaintiff emailed a draft of the charge she intended to file with the EEOC to a representative from defendant's hotline system. On July 16, 2012, plaintiff emailed Quick inquiring about her position's end date, to which he responded that it was in limbo. Plaintiff filed her EEOC charge on that same day. Less than ten days later, a July 23, 2012, an Advocate record indicates that plaintiff's status had been changed from "interviewing" for jobs to "severance anticipated."

On July 30, 2012, plaintiff informed Sanders that she had filed an EEOC charge. The next day, Quick emailed Sciarabba, stating that he "need[ed] [Sciarabba's] assistance with Armesha and putting together the 'business reason' for closing bed management." A day later, on August 1, 2012, plaintiff met with Quick and Sanders who informed her that she was terminated. Immediately following this meeting, plaintiff met with Sanders, who informed her that defendant would offer her a severance package if she agreed to drop her EEOC charge. Finally, a September 4, 2012, Advocate redeployment status report indicated that plaintiff had filed an EEOC charge. This evidence, with all reasonable inferences drawn in the light most favorable to plaintiff, is sufficient to allow a reasonably jury to find a causal connection between plaintiff's EEOC charge and defendant's adverse actions.[16] Accordingly, defendant's motion for summary judgment is denied as to Counts II and IV.

## CONCLUSION

For the foregoing reasons, defendant's motion (doc. 113) for summary judgment is granted in part and denied in part. The court grants defendant's motion with respect to plaintiff's

---

[16]The court, likewise, finds that this evidence is sufficient for a reasonable jury to find that "the desire to retaliate was the but-for cause of" defendant's actions. Univ. of Texas Southwestern Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013).

discrimination claims, and therefore enters judgment in favor of defendant Advocate North Side Health Network and against plaintiff Armesha Jones on Counts I and III. The court denies defendant's motion with respect to plaintiff's retaliation claims (Counts II and IV). Defendant's motion (doc. 120) to deny plaintiff's request to strike its motion for summary judgment is granted. This matter is set for a report on status July 12, 2016, at 9:00 a.m.

**ENTER:**　　　**June 29, 2016**

**Robert W. Gettleman**
**United States District Judge**